IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JIMMY CASTILLO,

        Plaintiff,

vs.                                                    CIVIL NO. 01-626 LFG/WWD

CITY OF ALBUQUERQUE et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT
## OF FAILURE TO TRAIN CLAIM

THIS MATTER is before the Court on Defendants' Fed. R. Civ. P. 56 Motion for Partial Summary Judgment No. II: Dismissal of Failure to Train Claim [Doc. 63]. The Court considered the motion and supporting documentation and evidence, together with Plaintiff Jimmy Castillo's ("Castillo") response in opposition and Defendants' reply. Oral argument is not necessary. This matter may be resolved based on the parties' submissions.

### Background

Castillo brings claims against the City of Albuquerque ("City"), Officer Andrew Lehocky ("Officer Lehocky") and Officer Michael Schaller ("Officer Schaller"). Castillo alleged that his constitutional rights were violated when he was viciously attacked by "Bart," a police service dog ("PSD") handled by Officer Lehocky. Castillo claims that Officer Lehocky "sicced" Bart on Castillo and that Bart caused him serious physical injury. Following the dog attack, Officer Schaller "discharged at point blank range his taser weapon directly into the chest area of plaintiff." (Plaintiff's Contention, IPTR, pp. 1,2 [Doc. 23]).

**Present Motion**

Castillo alleged that Officer Lehocky deployment of his PSD and Officer Schaller's use of an air taser device violated Castillo's right against the use of excessive force.[1] He asserts various municipal liability claims, including an allegation that the City failed to adequately train. This motion deals only with that portion of the claim alleging that the City failed to train Officer Lehocky.[2] Castillo's complaint is silent concerning any alleged municipal liability against Officer Schaller.

**Undisputed Facts**

In support of the motion for partial summary judgment, Defendants submit deposition testimony, affidavits and training documents concerning Officer Lehocky's and Bart's law enforcement training, as well as the training provided to Officer Lehocky's PSDs.

Prior to his employment with the City, Officer Lehocky earned a BA in criminology and successfully completed a 470-hour course of law enforcement training through the School of Public Service Police Academy. Upon graduation, he was certified to be a police officer in Michigan. (Lehocky Affidavit, I, A, 3, B,C).

Beginning on June 6, 1983, Officer Lehocky attended the APD Police Academy and received 704 hours of mandatory training. Defendants note that state law only requires a police officer to undergo a training course of not less than 400 hours. Thus, Officer Lehocky's training at the APD Police Academy approaches nearly twice the amount of training required by law for peace officers.

---

[1] An "air taser" is described in Hennigan v. Taser, 2001 WL 185122 (S.D.N.Y. Feb. 26, 2001) as "[a] stun gun, a non-lethal self-defense device."

[2] Castillo alleges that both officers violated his constitutional rights, and that the City failed to train Officer Lehocky. Castillo does not assert that the City failed to adequately train Officer Schaller, nor does Castillo argue that the use of an air taser itself is unconstitutional. Rather, the failure to train allegations all deal with Officer Lehocky and the use of police service dogs.

(Lehocky Affidavit, ¶ I, B, 4). Officer Lehocky's Academy training included courses in ethics, standard operating procedures, deadly force, less-lethal force, emotionally disturbed/suicidal/ intoxicated persons, search and seizure, civil liability, tactical operations, first aid, as well as intensive class work in law relating to assault, battery, deadly weapons and kidnaping. (Lehocky Affidavit, ¶¶ I, B, A-J).

In 1988, Officer Lehocky received special training as a "special weapons and tactics team" (SWAT) member. This training included 40 hours of specialized training by the U.S. Department of Energy Training Academy, "Special Response Team II." (Lehocky Affidavit, ¶ IV, 10, A). One month later, Officer Lehocky completed 80 hours of "Special Response Team III" training, also through the Department of Energy Training Academy. (Lehocky Affidavit, ¶ IV, B).

In addition to his basic APD Academy training, Officer Lehocky completed a significant amount of related training, including an 80-hour U. S. Department of Energy Central Training Academy course on "Intermediate Force Instructor Certification." This course provides personnel with self-defense skills, including falls and rolls, movement, interview stances, pressure control locks, personal weapons and striking areas, blocking, take downs, fighting from the ground, counter moves, demonstrator control, handcuffing techniques, weapon retention, gun take aways, hostage situations, and the use of side-handle batons. (Lehocky Affidavit, ¶ V, 11, D).

As part of his training, Officer Lehocky also completed an 8-hour course taught by Dr. George Thompson on "Verbal Judo." This course teaches an officer the appropriate use of words, tone and demeanor to compel others to comply with an officer without the need to resort to force. (Lehocky Affidavit, ¶ V, 11, E). Officer Lehocky also completed a 40-hour Drug Abuse Resistence course; and an 8-hour Drug Immigration Profile Seminar. (Lehocky Affidavit, ¶ V, 11, C).

3

Following his successful completion of his basic officer training at the Police Academy, on October 25, 1983, Officer Lehocky was awarded a police officer certification by the State of New Mexico. This certification allowed Officer Lehocky to work as an APD officer. (Lehocky Affidavit, ¶ I, B, 5).

After Lehocky became a City police officer, he was selected to serve as a PSD or Police Canine ("K-9") handler. Since that selection and for the ensuing 13 years, Officer Lehocky worked as a PSD or K-9 handler. (Lehocky Affidavit, ¶ III, 7). To qualify as a PSD/K-9 handler, Officer Lehocky received training from Adlerhorst International Police K-9 Training Academy in California. (Lehocky Affidavit, ¶ III, 8). The Academy provides PSD and K-9 training to 200 law enforcement agencies and is the largest PSD school in the world. Adlerhorst's training techniques and theories are considered "state-of-the-art" by national law enforcement agencies. (Lehocky Affidavit, ¶ III, 8, A). Adlerhorst's training director has 35 years of experience and a lifetime teaching credential from the State of California, with a specialty in police science. All other Adlerhorst staff have a minimum of 10 years of experience in the training of PSDs. (Lehocky Affidavit, ¶ III, 8, B). Defendants also note that Adlerhorst's Training Director Dave Reaver has been qualified as an expert witness by 25 courts, and is a national expert in training, behavior and deployment of PSDs, as well as an expert in the mechanics of dog bites. (Lehocky Affdavit, ¶ III, 8, C).

Officer Lehocky, together with four PSDs assigned to him, received canine handler training from Adlerhorst, which included completion of a 40-hour course entitled "Adlerhorst Police Dog Handler School II." (Lehocky Affidavit, ¶ III, 9, A). The course included a basic understanding of PSD's abilities and limitations, legal aspects of PSD handling, officer safety and tactical issues concerning PSD deployment, as well as current techniques and legal considerations. Officer Lehocky

4

completed this course with PSD "Carlo" in December 1988. (Lehocky Affidavit, id.) On December 2, 1988, Officer Lehocky received a certificate of completion for the Adlerhorst Police Dog Handler School II. (Lehocky Affidavit, ¶ III, 9, B).

The following year, in December 1989, Officer Lehocky completed 160 hours of training in a course called "Adlerhorst Police Dog Handler School I." This training qualified Officer Lehocky and "Arco," one of his PSDs, for duty as a PSD team. Among other things, Adlerhorst trained Officer Lehocky on PSD's abilities and limitations, officer safety and tactical issues concerning PSD deployment. (Lehocky Affidavit, ¶ III, 9, C).

The next year Officer Lehocky and Arco received additional training. They participated in a 24-hour course at Adlerhorst, described as "Adlerhorst Police Dog Handler School II." At the completion of this training, Officer Lehocky and Arco were certified for work as a team. In this course, as well as in his prior course with Arco, Officer Lehocky scored "very good." (Lehocky Affidavit, ¶ III, 9, D).

In December 1991, Officer Lehocky and Arco went through re-certification training and completed a 24-hour course, entitled "Adlerhorst Police Dog Handler School II." This course was required for re-certifying Officer Lehocky and Arco for work as team. As before, Officer Lehocky scored "very good" for the course. (Lehocky Affidavit, ¶ III, 9, E).

Similarly, in October 1992, Officer Lehocky and Arco trained and successfully completed a 24-hour course at the Adlerhorst facility, this time completing "Adlerhorst Police Dog Handler School II." This training re-certified Officer Lehocky and Arco for work as a team. (Lehocky Affidavit, ¶ III, 9, F).

In 1994 Officer Lehocky and his new canine "Robbie" completed the 24-hour certification course, "Adlerhorst Police Dog Handler School II." Completion of this course re-certified Officer Lehocky and qualified him and Robbie for work as a team. (Lehocky Affidavit, ¶ III, 9, G).

Two years later, in February 1996, Officer Lehocky successfully completed another 160-hour course, called the APSD Basic Handlers Course, this time with PSD "Bart," the PSD canine involved in the incident leading to this lawsuit. The course was entitled "APSD 88 Basic Handlers Course" and qualified Officer Lehocky and Bart for duty as a handler/PSD team. The course included training on the abilities and limitations of PSDs, officer safety and tactical issues that arose during PSD deployment. It also included presentations and legal updates on PSD litigation, training on current techniques, and legal considerations for PSD selection and deployment. (Lehocky Affidavit, ¶ III, 9, H).

In the spring of 1996, Officer Lehocky completed another 40-hour course, "Basic Canine Handler Development." This course was not taught through Adlerhorst, but was conducted by the Sheriff-Coroner Department of Orange County, California. The course focused on a PSD's abilities and limitations and officer safety, as well as tactical issues during deployment. It also included a component of use of PSD teams involving Special Weapon and Tactics Team ("SWAT"). (Lehocky Affidavit, ¶ III, 9, I).

The training Officer Lehocky received in 1996 included a presentation by attorney Eugene Ramirez, who specializes in the defense of police misconduct cases. Mr. Ramirez provided the legal update portion of the "Basic Canine Handler Development" course. He is an experienced police officer and attorney and is widely respected by PSD handlers and trainers throughout the country. (Lehocky Affidavit, ¶ III, 9, I, 2).

During the course of this training, attorney Ramirez provided Officer Lehocky with instructions concerning use-of-force standards as outlined in Graham v. Connor, 490 U.S. 386 (1990), and reviewed the facts, holdings and rationale of various federal circuit cases involving PSD use-of-force issues. (Lehocky Affidavit, Id.).

In May 1996, Officer Lehocky participated in and successfully completed a 360-hour course entitled "Adlerhorst Instructor's Course." This course, unlike his prior training, was focused on teaching Officer Lehocky to be an instructor for other handler/PSD teams. (Lehocky Affidavit, ¶ III, 9, J).

Also in the summer of 1996, Officer Lehocky successfully completed a course entitled "Working Dog Basic First Aid Training." (Lehocky Affidavit, ¶ III, 9, K). In mid-summer 1996, Officer Lehocky received a certificate from the New Mexico Department of Public Safety, Training and Recruiting Division, for the successful completion of 80 additional hours in the area of Patrol. This was taught as part of "APSD 88 Basic Handlers Course." (Lehocky Affidavit, ¶ III, 9, L).

On June 14, 1996, Officer Lehocky received another certificate from the New Mexico Department of Public Safety, Training and Recruiting Division, for the successful completion of 80 additional hours of canine instructor/handler training. The certificate was granted due to Lehocky's successful completion of the "Adlerhorst Instructor's Course." (Lehocky Affidavit, ¶ III, 9, M).

Subsequently, Officer Lehocky received additional training in a 16-hour course in May 1997 captioned "Adlerhorst Police K-9 Agitator." (Lehocky Affidavit, ¶ III, 9, N). In January 1998, both Officer Lehocky and his canine Bart were re-certified as a team following their completion of a 16-hour course entitled "APSD II." (Lehocky Affidavit, ¶ III, 9, O).

In February 2000 the United States Border Patrol sponsored the Southwest Regional Police K-9 Trials. Given their expertise as a team, Officer Lehocky and PSD Bart were selected as the first PSD team from the Albuquerque Police Department to represent the City at these trials. Officer Lehocky and Bart placed third in this regional competition in handler control/obedience. (Lehocky Affidavit, ¶ III, 9, P).

In addition to the numerous courses taken by Officer Lehocky and training received, the City requires "in service training" for all of its law enforcement officers. This requirement includes 40 hours of academic instruction approved by the New Mexico Law Enforcement Academy Board during each 24-month period of employment. (Lehocky Affidavit, ¶ II, 6).

In addition to officer training, the City maintains separate requirements for PSDs as part of the City's standard operating procedures. (Lehocky Affidavit, ¶ VI, A) Training requirements are contained in the APD K-9 Unit's Standard Operating Procedures and include components on dog training in Section 6-3-2, which provide specific directives and responsibilities concerning mandatory training for PSDs. (Lehocky Affidavit, id.; "Field Services Bureau Standard Operating Procedures, K-9 Unit").

Prior to the time Officer Lehocky obtained Bart as a partner, Bart received extensive training abroad. Bart was trained by the Royal Dutch Police Dog Association. (Lehocky Affidavit, ¶ VI, B). Bart received two years of PSD training at the Koninklijke Nederlandse Politiehond Vereniging. This training consisted of obedience work, agility, jumping exercises, food refusal and searching for small articles. Bart was also trained with water work, which included swimming and retrieval, as well as protection work, which included guarding objects, person search work, handler protection, protection work under stress, transportation of a decoy and recall of a dog pursuing a fleeing suspect. As a

result of Bart's successful completion of the course, Bart received a Politiehond I Certificate on May 13, 1995. In October 1995, Bart received a second training certificate, the Object Bewakingshond, following successful completion of his program. (Lehocky Affidavit, ¶ id.).

Adlerhorst procured PSD Bart from Koninklijke Nederlandse Politiehond Vereniging in late 1995, and ultimately conveyed Bart to the City of Albuquerque in January 1996. (Lehocky Affidavit, ¶ VI, D)  Thus, Bart received training as a PSD through the Royal Dutch Police Dog Association and through Adlerhorst.

In addition to the formal training provided to Bart by Koninklijke and Adlerhorst, Officer Lehocky maintained ongoing personal training for his canine. (Lehocky Affidavit, ¶ VI, C). Officer Lehocky testified that he trained Bart several times each and every month and that he and Bart worked together as a handler/PSD team for APD. (Lehocky Affidavit, ¶ VI, C). While the number of hours of training varied, Officer Lehocky testified that they worked together on training a minimum of five hours a month to a maximum of thirty hours. Officer Lehocky testified that his individual training with Bart averaged 10-15 hours per month. (Lehocky Affidavit, id.).

Officer Lehocky characterized as "rigorous" the training that included obedience, performance of specific tasks in response to voice commands, heeling on a leash, heeling off a leash, long down, down re-call, stand/down/sit, agility, negotiating obstacles and retrieving. (Lehocky Affidavit, id.). Bart received training from Officer Lehocky on searches, observing with olfactory and auditory senses, building searches, apprehension training, "guard and bark" techniques, take downs, "detain and control," and the "bite and hold" technique. (Lehocky Affidavit, ¶ VI, C, D).

After APD acquired Bart, it provided its individual training to him. In February 1996, Officer Lehocky and Bart completed a 160-hour course entitled "APSD 88 Basic Handlers Course," which

9

qualified Officer Lehocky and Bart for duty as a team. In January 1998, Officer Lehocky and Bart completed another 16-hour course entitled "APSD II," which re-certified Officer Lehocky and Bart for duty as a team. Bart's training has been documented and training records are maintained by APD's K-9 Unit. (Lehocky Affidavit, ¶ VI, D).

Adlerhorst provided ongoing evaluations for Bart during the time Bart served as a PSD for APD. Evaluations of his capabilities occurred on March 27, 1996, June 19, 1996, August 28, 1996, September 25, 1996, February 24, 1997, May 28, 1997, August 26, 1997, September 22, 1998, June 2 & 3, 1999, August 3 & 4, 1999, November 2 & 3, 1999, January 12, 2000, January 19 & 20, 2000, and April 4 & 5, 2000. Bart passed each of his evaluations conducted by Adlerhorst. (Lehocky Affidavit, ¶ VI, D, E).

## **Analysis**

In support of its motion, the City submits a virtual mountain of admissible evidence on the issue of training. The City demonstrated by affidavit and exhibits that Officer Lehocky has received substantial and ongoing training as a police officer and PSD/K-9 handler, and, indeed, as a trainer of handlers. The amount of training documented is extraordinary. So, too, the training provided to the PSDs is significant and ongoing. Moreover, the City submitted admissible evidence demonstrating that it maintains protocols and standard operating procedures relating to the use of PSDs, and that it maintained training records for both its officers and for dogs handled by the officers. Clearly, the City has made a *prima facie* showing of adequate, if not outstanding, training. It has demonstrated an entitlement to summary disposition of Castillo's claims on the failure-to-train issue.

When faced with a *prima facie* showing, the burden shifts to the party opposing the motion to come forward with admissible evidence by way of affidavit, deposition testimony, admissions or

10

answers to interrogatories which demonstrates a factual dispute on a material issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996). Since the purpose of the Rule 56 procedure is to cut through the allegations of the pleadings and to determine whether there exists a triable issue, a party opposing the motion for summary judgment may not rely on mere denials or reference to allegations in the pleadings, or argument and contention of counsel. Rather, the party opposing the motion has an affirmative obligation to come forward with clear, admissible evidence demonstrating an issue for the trier of fact. Castillo fails to carry this burden.

For example, Castillo concedes in his response that, "Defendants present voluminous evidence that police service dog "Bart" has had an impressive history of training," (Memorandum in Support of Response, p. 1), and "Defendants also provide an impressive array of training received over the years by Defendant Lehocky." (Memorandum in Support of Response, p.2). Rather than coming forward with admissible evidence demonstrating a lack of training to support his contentions of failure to train, Castillo simply argues, through counsel, "ineffective training is just as bad as no training at all." (Memorandum in Support of Response, p. 2). Castillo offers no expert who may have reviewed the intensive training regime and found it "ineffective." Nor does Castillo submit any evidence at all to support the claim that the training provided was ineffective or tantamount to no training at all. This is merely argument and contention. It is insufficient to raise a triable issue of fact on the matter relating to training. *See* Fritzscke v. Albuquerque Municipal School District, ___ F. Supp. ___, 2002 WL 533878 at *10 (D.N.M. March 25, 2002)(*citing* Powell v. COBE Laboratories, Inc., 208 F.3d 227 (table, text in Westlaw, 2000 WL 235241)(10th Cir. 2000) (arguments of counsel are not evidence).

Castillo makes conclusory statements that "despite the years of training received by Defendant Lehocky, he repeatedly violated individual's constitutional rights by utilizing excessive police force." (Response, p. 2). In support of this conclusion, Castillo states that Officer Lehocky has been named as a defendant in eight cases.[3]

The sequence of the logic is this: because Officer Lehocky has been named as a defendant in other lawsuits, the City had knowledge of his unconstitutionally permissible use of excessive force. Having this knowledge, the City knew or should have known that Officer Lehocky was poorly trained. Knowing Officer Lehocky was poorly trained, the City had an obligation to train him.

While the logic has plausible appeal, it fails to withstand close scrutiny. Castillo argues that these prior cases serve to give notice of Officer Lehocky's use of unconstitutionally excessive force. However, of the cases relied on, some are not applicable even for purposes of notice. For example, Patterson-Montgomery v. City of Albuquerque, CIV 01-444, arises out of an incident that occurred on April 25, 2000. This was after the April 10, 2000 incident involved in the Castillo case. Thus, neither the incident nor the filing of the Patterson-Montgomery case, can serve as appropriate notice to the City of Officer Lehocky's alleged unconstitutional activities. Similarly, Castillo relies on Booker v. City of Albuquerque, CIV 02-208. Not only did the Booker incident occur on August 31, 2001, more than a year after the Castillo incident, but it doesn't even involve Officer Lehocky. The Booker case cannot serve to put the City on notice that it inadequately trained Officer Lehocky.

---

[3] Tortolita v. City of Albuquerque, USDC CIV 92-107; Waddles v. City of Albuquerque, USDC CIV 92-492; Ortiz v. City of Albuquerque, USDC CIV 96-414; Smith v. City of Albuquerque, USDC CIV 01-416; Chavez v. City of Albuquerque, USDC CIV 00-307; Patterson-Montgomery v. City of Albuquerque, USDC CIV 01-444; Marquez v. City of Albuquerque, USDC CIV 01-445; Booker v. City of Albuquerque, USDC CIV 02-208; and in State District Court, Ramkowsky v. City of Albuquerque, D-202-CV-9002864.

Three of the cases, <u>Tortolita v. City of Albuquerque</u>, CIV 92-107; <u>Waddles v. City of Albuquerque</u>, CIV 92-492; and <u>Ortiz v. City of Albuquerque</u>, CIV 96-414, have all been dismissed without any judge or jury ever finding wrongdoing, fault or liability on the part of Officer Lehocky or the City. Indeed, in <u>Ortiz</u>, the plaintiff dismissed claims against Chief of Police Polisar and Officers Scott and Lehocky. [Doc. 43]. Thereafter, the Plaintiff's claims against the City were resolved. [Doc. 44]. The dismissal of claims against Officer Lehocky hardly serves as notice that his conduct was unconstitutional, illegal or negligent.

Similarly, the <u>Tortolita</u> lawsuit was dismissed by plaintiff pursuant to Fed. R. Civ. P. 41(a)(1)(ii) on September 11, 1992. There is no finding or determination by judge or jury that any defendant was negligent or acted in violation of federal statutory or constitutional law. So, too, in <u>Waddles</u>, the case was dismissed for the reason that "all claims have been mutually resolved." [Doc. 175]. This dismissal occurred on November 9, 1994. As in the <u>Tortolita</u> case, there is no judge or jury determination of any kind of wrongdoing, and any settlement was without a finding or inference of wrongdoing.

<u>Smith v. City of Albuquerque</u>, CIV 01-416, arises out of an incident that pre-dates the Castillo incident. In <u>Smith</u>, the incident occurred on February 26, 1989. However, no lawsuit was filed until April 13, 2001. That case is pending in the United States District Court and as yet there has been no finding of fact or jury determination concerning liability. The same is true for <u>Chavez v. City of Albuquerque</u>, CIV 00-307 and <u>Marquez v. City of Albuquerque</u>, CIV 01-445. The Chavez incident occurred on February 16, 1998, and the Marquez incident occurred on August 10, 1999. Both cases are pending and in neither case has there been a finding of illegal, negligent or unconstitutional conduct on the part of any defendant.

13

In sum, what Castillo offers is simply argument and contention. Castillo offers no evidence that prior to the incident in question, a court, a judge or a jury found that Officer Lehocky violated the constitutional rights of any individual. As previously indicated, Rule 56 requires that the party opposing a motion for summary judgment submit admissible evidence demonstrating the presence of a factual issue. Here, Castillo failed to rebut Defendants' *prima facie* showing that Officer Lehocky and Bart were adequately trained by the City.

In the absence of Castillo's ability to demonstrate the presence of a material issue of fact in dispute, the Court finds that Defendants made a *prima facie* showing of an entitlement to partial summary judgment. Accordingly, the Court grants Defendants' Motion for Partial Summary Judgment No. II and dismiss, with prejudice, Castillo's failure to train claim.

*[signature]*
Lorenzo F. Garcia
United States Magistrate Judge

ATTORNEY FOR PLAINTIFF:
Samuel H. Bregman, II, Esq.

ATTORNEYS FOR DEFENDANTS:
Kathryn Levy, Esq.
Stephen G. French, Esq.
Luis E. Robles, Esq.
Robert W. Becker, Esq.
Christina Robles Anaya, Esq.